

**FILED**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

**SEALED**

AUG 2 7 2008

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

Lawrence Leland "Lee" Loomis,
laptop computer,
computer storage media,
cellular telephone,
and personal digital assistant

**APPLICATION AND AFFIDAVIT**
**FOR SEARCH WARRANT**

Case Number:

2:08 - SW - 362 DAD

I, Kathleen A. Nicolls being duly sworn depose and say:

I am a(n) Special Agent, Federal Bureau of Investigation and have reason to believe that
☒ on the person of or ☒ on the property or premises know as (name, description and/or location)

Lawrence Leland "Lee" Loomis, a Caucasian male, approximately 6' 1" in height and 190 pounds, approximately 51 years of age, gray hair, including his laptop computer, all computer storage media, his cellular telephones, and any personal digital assistant ,

in the _____ Eastern _____ District of _____ CALIFORNIA _____
there is now concealed a certain person or property, namely (describe the person or property to be seized)

**See Attachment B hereto, which is incorporated by reference as if set forth in full**

which is (state one or more bases for search set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)
**evidence, fruits, and instrumentalities**

concerning a violation of Title **18** United States Code, Section (s) **1341, 1343, 1344, 1349, 1028, 1956 1957**.
The facts to support a finding of probable cause are as follows: **See attached Affidavit of Special Agent Kathleen A. Nicholls**
Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

_Kathleen A. Nicolls_
Signature of Affiant
Kathleen A. Nicolls
Special Agent, FBI

Sworn to before me and subscribed in my presence,
August 26, 2008 _____   at Sacramento, California
Date                                          City                    State

Dale A. Drozd, United States Magistrate Judge
Name of Judge                    Title of Judge

_Dale A. Drozd_
Signature of Judge

## AFFIDAVIT

## AFFIDAVIT OF KATHLEEN NICOLLS IN SUPPORT OF SEARCH WARRANT

### I. BACKGROUND AND EXPERIENCE OF AGENT

I, Kathleen Nicolls, first having been duly sworn, do hereby state as follows:

1.    I am a Special Agent with the Federal Bureau of Investigation (FBI), presently assigned to the Sacramento office. I have been employed as a Special Agent since September 2006. As part of my duties and responsibilities, I investigate loan and credit fraud, mail fraud, wire fraud, bank fraud, and money laundering under 18 U.S.C. §§ 1014, 1028(a), 1341, 1343, 1344, 1956 and 1957. I have attended training in various aspects of criminal investigation as well as classes and seminars dealing specifically with money laundering, asset seizure and forfeiture, various financial investigative techniques, and related financial investigations.

2.    I have learned the facts of this investigation from my own personal involvement, as well as from Special Agent Christopher S. Fitzpatrick of the Internal Revenue Service-Criminal Investigation, and other agents working this case.

3.    On August 25, 2008, the Hon. Dale A. Drozd, United States Magistrate Judge, approved a search warrant of a two locations: (1) the office space of Loomis Wealth Solutions, at 2424 Professional Drive in Roseville, California, and (2) the residence of Lee Loomis, located at 7915 Shelborne Drive, Granite Bay, California. An unsigned copy of the search warrant affidavit that Judge Drozd approved is attached hereto as Exhibit A.

4.    This affidavit is made in support of a rollover warrant to seize from the person of Lawrence Leland "Lee" Loomis ("Lee Loomis"), a Caucasian male, approximately 6' 1" in height and 190 pounds, approximately 51 years of age, gray hair, the following items: a laptop computer, all computer storage media, all cellular telephones, all personal digital assistants, personal indicia, and files or papers on his person, in order to search for evidence, fruits, and instrumentalities of crime, as more particularly described in Attachment B, hereto.

5.    In executing the search warrants referred to in Paragraph 3, above, agents learned today from Lee Loomis's wife, Lisa Loomis, and from trusted employees, that Lee Loomis left Sacramento in the morning on a business trip to the Los Angeles area. According to employees, Loomis was meeting in Los Angeles with Joseph Gekko, the owner of Lender Services Direct, one of the fraudulent entities discussed in the original affidavit. Lender Services Direct is the unlicensed escrow closing company that Loomis has used in attempting to execute his builder bailout scheme with both Ranchwood Homes and with Sunvest Communities USA. According to employees, Loomis was meeting with Gekko as part of a plan to close home sales in the Orlando area. Those home sales are believed to the be the same fraudulent transactions on which  Loomis was working with Michael Llamas, Christopher Warren, Garret Gililland, and Jay Grivette, in June 2008, involving Sunvest Communities USA. Employees reported today that Loomis expected to receive today several hundred thousand dollars as a result of this transaction.

6.    Because Loomis was traveling in Los Angeles as the warrants were executed, it was not possible to seize his personal computer, cellular telephone, any personal digital assistant, and any documents on his person.

7.    During the execution of the search warrant at the business location, Lee Loomis himself called to speak with agents. Loomis stated that he flew to Southern California on Southwest Airlines and had plans to return to Sacramento this evening.

8.    Agents were able to verify with the TSA Task Force Lee Loomis's travel plans on Southwest Airlines. Presently, he is confirmed to return to Sacramento around 8:30 p.m., this evening, August 26, 2008, on Southwest Airlines.

9.    According to Lisa Loomis, Lee Loomis took his personal computer and his cellular telephone with him. Employees informed agents that Loomis often travels with his computer and phone. From my training, experience and discussions with experienced white-collar crime investigators, I know that it is common for individuals who are running businesses (whether

Affidavit of Special Agent Nicolls

2

lawful businesses, wholly illicit businesses, or lawful businesses which commit unlawful activities related thereto) to maintain records related to the businesses and their activities. From training and experience, I believe that white collar criminals who travel on business often travel with personal indicia; seeing themselves as business people, they also often travel with personal digital assistants and documents related to the fraudulent transactions they are currently working on.

10.    As stated in the original affidavit at Paragraph 60, and incorporated herein by reference, Loomis Wealth Solutions and related entities listed in Paragraph 60 are permeated by fraud. I have probable cause to believe these entities exist merely as a means to execute a scheme to defraud and that all of the business's records are likely to be evidence of criminal activity and, therefore, subject to seizure. Lee Loomis is the president and/or control person of entities permeated by fraud, and he is traveling today on business related to this fraud. Accordingly, the items described in Paragraph 4, above, are subject to seizure and to search for evidence, fruits and instrumentalities, as described in Attachment B.

11.    In searching documents seized from Loomis, agents will employ the privilege review  procedure described in Paragraph 71 of the attached affidavit, which is incorporated herein by reference.

12.    For the reasons stated in Paragraphs 68 and 69 of the attached affidavit, incorporated herein by reference, in seizing and search computer data, cellular telephones, and computer memory media, the procedures described in Paragraph 70 (including subparts) of the attached affidavit, also incorporated herein by reference,  will be followed.

13.    For the reasons set forth in the attached affidavit, and the additional facts learned today, I have probable cause to believe on the person of Lee Loomis are a personal laptop computer, computer storage media, cellular telephone, a personal digital assistant, personal indicia, and files or papers on his person in order to search for evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1341 (Mail Fraud), 1343 (Wire Fraud), 1344

Affidavit of Special Agent Nicolls

3

(Bank Fraud), 1349 (Conspiracy to Commit Mail, Wire and Bank Fraud), 1028 (Identity Theft), 1956 & 1957 (Money Laundering), as more particularly described in Attachment B, hereto.

13.  For the reasons stated in Paragraph 72 of the attached affidavit, I request that this affidavit and the attached affidavit be sealed pending further order of the Court.

Kathleen Nicolls, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this 26th day of August, 2008.

Hon. Dale A. Drozd
United States Magistrate Judg

Approved as to Form:

Russell L. Carlberg
Assistant United States Attorney

## ATTACHMENT B:
### ITEMS TO BE SEIZED

The following items are to be seized:

1. Articles of personal property tending to establish the identity, passports, airline tickets, travel documents, and other items which establish personal identification.

2. Invoices, statements, receipts, contracts, agreements, Western Union and other financial wire transfer service receipts, credit card receipts, money order receipts, records/receipts reflecting payments made by and on behalf of, or received from customers and business associates, records/receipts reflecting electronic funds transfers, documents reflecting safety deposit box locations held by, among, or on behalf of said entities and persons, payroll records, loan records, owner/partner distributions, and records/receipts tending to reflect payments made by or refunds made to customers and business associates or the expenditure of funds received from customers or business associates.

3. Address books, files and records evidencing the identity of customers, clients and associates; business correspondence, facsimile records, correspondence to/from overnight courier services, accounting ledgers and journals; work papers, customer lists, personnel records, pay records, and customer complaints against the company, and other associated companies and individuals.

4. Bank, financial institution, and investment account records, check books, statements, deposit slips, canceled checks, customer checks, cashier's checks, cash in excess of $1,000, loan records, financial statements, credit reports, records of wire transfer, treasurer's checks, keys to safe-deposit boxes, and tax returns and return information.

5. Records of corporations, partnerships, joint ventures and business trade names.

6. Any and all documents and materials relating to the purchase or sale of real estate including loan files, title company records, mortgage loan applications, correspondence, escrow records and instructions, lender verifications of employment records, HUD-1s, copies of appraisals, invoices for work or credits claimed.

7. All periodic account statements sent to members or client investors.

8. All correspondence, contracts, drafts of contracts, option contracts, joint venture agreements and settlement agreements.

9. All financial plans, worksheets, copies of tax returns, Forms 1099, Forms W-2, pay stubs, bank statements, and other financial records of members or client investors.

10. All private placement memoranda (PPM) and documents related to offers of sale of securities or units of ownership of the NARAS Secured Fund LLC, NARAS Secured Fund #2 LLC and

1

11. Any documents, records or materials that evidence newspaper, internet or other advertising or solicitation of tenants to rent residential properties.

12. Shipping documents/receipts to or from Federal Express, Airborne Express, United Parcel Service, the United States Postal Service, and opened and unopened United States Mail and/or items shipped by other courier services.

13. Any documents related to civil actions and claims and any recordings of telephone conversations, employee conversations, and answering machine tapes pertaining or related to business operations.

14. Any and all documents pertaining to: Lee Loomis, Lisa A. Loomis, John Hagener, Paul Hagener, Loomis Wealth Solutions, Advantage Financial Group ("AFG"), AFG Holdings LLC, AFG Technologies, AFG Holdings Management, Advantage Financial Partners of California LLC, Advantage Financial Partners of Illinois LLC, AFP of Utah, Nationwide Lending Group, NARAS Secured Fund LLC, NARAS Secured Fund #2 LLC, Lismar Financial Services LLC, North State Property Management, Green Ivy Property Management, Stony Creek Partners LLC, Essence Financial, LW Premier Holdings LLC, Park Place Partners, Lender Services Direct, Inc., Christopher Warren, Scott Cavell, Dawn Powers, Superior Escrow Closings, Michael Llamas, Peter Woodard, Joseph Gekko, Johnny "Jay" Grivette, Jr., G & L Real Estate, L & G Mortgage Company, Sunvest Communities USA, Ranchwood Homes, KB Homes, and Garret Griffith Gililland III.

15. Documents, programs, applications or materials created, modified or stored in any form, including electronic or computerized data.

16. In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedures:

    a. Upon securing the area around the person of Lee Loomis, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items can be searched in the area in a reasonable amount of time and without jeopardizing the ability to preserve the data. If such material may be safely searched within a reasonable period of time, then the law enforcement personnel with computer expertise who are conducting the searches are directed to do so. ·

    b. If the computer personnel determine it is not practical to perform an on-site search of the data within a reasonable amount of time, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

    c. In searching the data, the computer personnel may screen the data contained in the computer equipment and storage devices to view their precise contents and determine

2

whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

    d. If the computer personnel determine that the data does not fall within any of the items to be seized pursuant to this warrant, the government will return these items within a reasonable period of time not to exceed 90 days from the date of seizure unless further authorization is obtained from the Court.

17. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

    a. Any computer equipment, software, and storage device capable of being used to commit, further or store evidence of Mail Fraud, Wire Fraud, Bank Fraud, Conspiracy, Money Laundering, Engaging in Monetary Transactions Over $10,000 in Property Derived from Specified Unlawful Activity, and Identity Theft, in violation, respectively, of Title 18 United States Code, Sections 1341, 1343, 1344, 1349, 1028, 1956, 1957, and 1028;

    b. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

    c. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, thumb drives, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, personal digital assistants;

    d. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

    e. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

    f. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

    g. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

ATTACHMENT A


(See Attached Search Warrant Affidavit of Christopher Fitzpatrick)

## AFFIDAVIT OF CHRISTOPHER S. FITZPATRICK
## IN SUPPORT OF SEARCH WARRANT

### I. BACKGROUND AND EXPERIENCE OF AGENT

1.     I, Christopher S. Fitzpatrick, having been duly sworn, do hereby depose and state the following:

2.     I am a Special Agent with Treasury Department, Internal Revenue Service - Criminal Investigation ("IRS-CI"), presently assigned to the Sacramento office. I have been employed as a Special Agent since September 2001. In the course of my employment with the IRS-CI, I have conducted or been involved in more than 100 investigations of alleged criminal violations, which have included: aiding or assisting in the preparation of false tax returns (26 U.S.C. § 7206(2)); conspiring to defraud the United States with respect to claims (18 U.S.C. § 286); money laundering (18 U.S.C. §§ 1956, 1957); identity fraud (18 U.S.C. § 1028); conducting an unlicensed money transmitting business (18 U.S.C. § 1960); structuring cash transactions (31 U.S.C. § 5324); mail fraud (18 U.S.C. § 1341); wire fraud (18 U.S.C. § 1343); bank fraud (18 U.S.C. § 1344); false statements in connection with a loan (18 U.S.C. § 1014); theft, embezzlement, or misapplication by bank officer or employee (18 U.S.C. § 656); assisting in the unlawful interception and reception of communications service offered over a cable system (47 U.S.C. § 553(a)(1)); importing controlled substances (21 U.S.C. § 952); distributing controlled substances (21 U.S.C. § 841(a)(1)); making a false statement (18 U.S.C. § 1001); criminal conspiracy (18 U.S.C. §§ 371, 1349) and forfeiture (18 U.S.C. §§ 981, 982). Most of these investigations focused on individuals deriving property from illegal activity.

3.     I have attended more than 1,000 hours of training in various aspects of criminal investigation, and I have attended classes and seminars dealing specifically with money laundering, various financial crime techniques, and related financial investigative techniques.

### II. PREMISES TO BE SEARCHED

4.     This affidavit is made in support of a warrant to search the following locations:

1

a.  A business office located at 2424 Professional Drive, Roseville,
California 95661, which is more particularly described in Attachment "A-1"; and

b.  A residence located at 7915 Shelborne Drive, Granite Bay, California
95746, which is more particularly described in Attachment "A-2."

### III. STATUTORY VIOLATIONS

5.      Based on information set forth in this affidavit I have probable cause to believe
that Lawrence Leland Loomis, aka Lee Loomis ("Loomis"), John Hagener ("Hagener"), and
others are using numerous entities they own or control to operate a fraudulent multi-tiered
investment program which uses the mails and interstate wires to solicit customers and receive
money in violation of 18 U.S.C. § 1341 (Mail Fraud) and 18 U.S.C. § 1343 (Wire Fraud). I also
have probable cause to believe that Loomis and Hagener and entities they control have
conducted a mortgage fraud scheme by which "mortgage helpers" under the direction of Loomis,
Christopher Warren, and others have falsified employment histories and financial data of
investors of Loomis Wealth Solutions in order to secure home mortgages for their investors
under false pretenses, in violation of the 18 U.S.C. §§ 1341 (Mail Fraud), 1343 (Wire Fraud),
and 1344 (Bank Fraud), and 1349 (Conspiracy to Commit Mail, Wire and Bank Fraud), and
Section 1028 (Identity Theft). Likewise, Loomis and Hagener have defrauded their own
investors by conspiring with home builders to sell them homes at vastly inflated prices, which
are concealed from the home purchasers and lending institutions. The home builders then kick
back a share of the inflated price to the Loomis entities at the close of escrow. I also have
probable cause to believe that Loomis has conducted financial transactions with the proceeds of
this unlawful activity in violation of 18 U.S.C. §§ 1956 and 1957 (Money Laundering).

6.      The Loomis and Hagener entities involved in the fraud identified to date include:
Loomis Wealth Solutions, Advantage Financial Group ("AFG"), AFG Holdings LLC, AFG
Technologies, Advantage Financial Partners of California LLC, ("AFP-California"), Advantage
Financial Partners of Illinois LLC ("AFP-Illinois"), AFP of Utah, Nationwide Lending Group,
NARAS Secured Fund LLC, NARAS Secured Fund #2 LLC ("NARAS Fund"), Lismar

2

Financial Services LLC, North State Property Management, Green Ivy Property Management, Stony Creek Partners LLC, and Essence Financial. Closely associated entities and persons who have participated in the fraud scheme, conspired with and/or aided and abetted Loomis and Hagener in perpetrating the fraud include the following: LW Premier Holdings LLC, Park Place Partners, Lender Services Direct, Inc., Christopher Warren, Scott Cavell, Superior Escrow Closings, Michael Llamas, Melissa Sharrick, Peter Woodard, Joseph Gekko, Johnny "Jay" Grivette, Jr., G & L Real Estate, L & G Mortgage Company, and Garret Griffith Gililland III.

7.     Through my personal participation, including my review of documents as well as the interviews of victims and other individuals, I have become familiar with the facts and circumstances of this investigation. The information set forth in this affidavit reflects my personal knowledge or has been provided to me by other law enforcement officers, sources, victims and other interested parties. I have also received information through the review of various database searches. As this affidavit is being submitted for the limited purpose of securing authorization to execute a search warrant at two specific locations, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are relevant in connection with this application to obtain authorization to conduct the herein described searches. The basis of my opinions and conclusions set forth below are the result of my investigation.

## IV. PROBABLE CAUSE

### A.     Summary of the Fraud Scheme

8.     The investigation has revealed that Loomis Wealth Solutions solicits individuals to invest in what Loomis describes as a three-tiered investment program. At public two-hour investment seminars, Loomis initially pitches his plan. Loomis promises his company will serve as an unpaid financial advisor, drafting individualized financial plans for families to get out of debt and to put their home equity to work earning money for college and retirement. Loomis tells investors that social security and other retirement plans won't survive in the future, but his visionary plan will. Persons who attend the two-hour seminar submit financial information such as tax returns, pay stubs, copies of bills, and information concerning their home equity. Loomis

3

then analyzes the information and selects those whom he later invites to a private two-day workshop. He targets families with substantial home equity and with good credit.

      9.     At the workshop, prospective investors are told that to enter into the Loomis program, they must purchase a whole life insurance policy indexed to the stock market. Purchasing the life insurance policy qualifies one as a "Tier 1" investor with Loomis Wealth Solutions. Loomis promises investors that his overall program is so profitable, that if they agree to become "Tier 2" investors, he will even advance the cost of their life insurance policies for the first year, loaning them the substantial monthly premiums of around $1,300. Loomis does not disclose to investors that he receives a referral fee of approximately $25,000 from AmerUs Insurance (now Aviva, Inc.) if the policy is paid for one year. To become a "Tier 2" investor, in order to enjoy the benefits of Loomis's advancing of life insurance premiums, one is strongly encouraged to refinance one's home and take all of the equity out and invest it with Loomis.

      10.    Loomis arranges the re-financing of his investors' primary residences. In some cases, he steers them into negative amortization loans that he does not disclose as such. Once the equity is removed from the investor's primary residence, Loomis then urges investors to pay off small consumer credit debts. This is part of Loomis's confidence game: by not taking every last dime and by requiring the payment of higher-interest debt, Loomis inspires trust. But the substantial remainder of the home equity must then be invested by purchasing "units" of the NARAS Secured Fund #2 LLC. The NARAS Fund is a $10,000,000 private placement of unregistered securities. The NARAS Fund is controlled by John Hagener, who is Lee Loomis's father-in-law. Hagener uses an entity called Lismar Financial Services, LLC, to manage the NARAS Fund.

      11.    Loomis promises investors a guaranteed 12% annual return on investment with the NARAS Fund. Loomis claims that the pooled money in the NARAS Fund is loaned out to subprime borrowers at 14%. This supposedly enables Loomis to return 12% to investors, clearing a modest 2% as profit for himself.

      12.    NARAS Fund investors are mailed periodic statements showing their ever-increasing "balance" in the fund. The balance is stated as a dollar amount, always increasing by the promised 12%. The fund is also represented to investors as essentially liquid. In fact, the fund is not liquid. According to a trusted employee, it currently has about $1,700 in it, when it is

4

supposed to have millions. Among other things, it has long been depleted to pay company operating expenses, including to pay Lee Loomis approximately $400,000 per year in compensation and to pay trusted employees, such as the 23-year old Christopher Warren, around $225,000 per year, Lisa Loomis $40,000 per year for writing a newsletter, and her brother, Paul Hagener, approximately $140,000 per year. New investor money has simply been brought in to keep the fund afloat. Additionally, Loomis used Stony Creek Partners, LLC to divert several hundred thousand dollars of investor money to purchase commercial real estate where his company is located at 2424 Professional Drive in Roseville. Loomis is believed simply to pay the Amerus/Aviva insurance premiums out of the investor's own money that goes into the NARAS Fund. Loomis claims that the NARAS Fund account balance statements are based, in part, on the value of the subprime mortgage notes he carriers back as second mortgages on the homes that he has his "Tier 3" investors purchase. But for the reasons stated above, as well as for those explained in further detail below, there is simply no integrity in the NARAS Fund account statements that Loomis and Hagener periodically mail to investors as lulling statements.

13.     After investing their home equity into the NARAS Fund, investors with Loomis Wealth Solutions are offered the opportunity to become "Tier 3" investors. Being a "Tier 3" investor consists of serving as what Loomis actually calls "nominees" to purchase residential real estate in California, Florida, Arizona and Illinois. The individual investors are then matched with multiple properties "in the pipeline" that are purchased from new home builders and others. "Mortgage helpers" employed at Loomis Wealth Solutions and associated entities, such as AFP-California, AFP-Illinois, AFP-Utah, Nationwide Lending Group, and LW Premier Holdings, assemble the investors' financial data and prepare the loan applications using false information. Sources report that at Christopher Warren's direction, "mortgage helpers" use sophisticated computer programs to scan and alter W-2 forms, tax returns, and other financial documents.

14.     Loomis's Ponzi scheme also includes a builder bailout scheme. Loomis Wealth Solutions and related entities, such as LW Premier Holdings, approach new home and condominium builders across California, Florida, Arizona, and Illinois. The Loomis entity contracts to purchase distressed homes in bulk at a substantial discount from the public listing price. A discount of approximately thirty-five percent (35%) is negotiated on a bulk sale of, say, 48 homes. This becomes the "option price" on the homes. The contracting entity, say LW

5

Premier Holdings, then steers its Loomis investor "nominees" into purchasing the homes for the "purchase price," which is the full price before any "option price" discount is applied. The "option price" then goes undisclosed to the Loomis investors. Loomis or LW Premier Holdings is guaranteed a "referral fee" equal to thirty-five percent (35%) of the "purchase price" upon close of escrow. The "referral fee" like the "option price" is not disclosed to the Loomis "nominee" purchasers. In both contracts, the builder and the Loomis-related-entity promise to obtain appraisals on each home for $10,000 above the "purchase price." It is believed that certain corrupt appraisers "hit the numbers" provided by the builders and the Loomis-related-entity. The appraisals are then provided to the Loomis investors to show them that they are getting a deal below "fair market value." It is possible that the appraisals are also provided to the lender along with a fraudulent HUD-1 that conceals the fact that the true purchase price of the homes are only sixty-five percent (65%) of what is reported.

15.     Loomis then uses John Hagener's company, Nationwide Lending Group, to force his investors to carry a second mortgage for 20% of the inflated value of the homes. According to a trusted employee, he then charges the investor a 14% interest rate on the second mortgage that is actually funded by the investor's own investment in the NARAS Fund (which guarantees the investor a 12% return on investment.) Thus, Loomis completes his circle of fraud. The NARAS Fund account balance statements are derived in part, according to Loomis, on the "value" of the 20% stake in each property. But it is important to recall that this 20% stake is very inflated because the true purchase price was around 65% of the appraised value of the homes.

16.     Loomis tells his "Tier 3" investors that his property management companies will place renters into the homes. Loomis promises to service the mortgage payments, taxes, and insurance from the rental proceeds. He guarantees a positive cash flow of over $300 per property with his "shared equity program." Loomis offers to distribute these profits to investors on a monthly basis, but strongly urges investors to apply it toward their life insurance premiums. Property management companies manages the properties, collects the rent, and pays the mortgages.

17.     As of today, Loomis has missed multiple tax, mortgage, and insurance payments on the properties. In July 2008, Loomis's property management entities bounced approximately

6

$800,000 in mortgage checks. Loomis has recently bled the company of its last $300,000, placing it into a personal bank account. Bank records reflect that the NARAS Fund is almost broke. Loomis recently informed investors that they would have to pay their own life insurance payments and cover all the mortgage, tax and insurance payments coming due on their properties. Loomis advised that he is planning new investment funds that will rescue the company and that investors are welcome to invest in his new funds. Those funds, Loomis claims, are not based on real estate investment, but on commodities trading.

18.     Our investigation has revealed that AFP-California, AFP-Illinois, AFP-Utah, and Essence Financial are all predecessor entities to Loomis Wealth Solutions operating with largely the same model of investment fraud.

B.     Prior Bankruptcy

19.     According to United States Bankruptcy Court records, on or about May 23, 1996, Loomis filed for Chapter 7 bankruptcy in the Northern District of Illinois - Chicago. On the Summary of Schedules Loomis listed his assets as $5,850 and his liabilities as $919,425.14. Loomis holds himself out as a visionary investment advisor. Most investors and employees interviewed to date state that Loomis never disclosed his prior bankruptcy.

C.     Interviews of Investors

20.     During the course of this investigation, Federal Bureau of Investigation Special Agent Nicolls, California Department of Real Estate Senior Deputy Commissioner Sommers, and I interviewed four of the investors who have invested in Loomis's various companies. Each of the investors gave substantially similar accounts of how they became involved with Loomis. They read an advertisement about an investment opportunity; attended a two-hour workshop, and then attended a two-day seminar. Although some of the investors provided different details, the overall story of the fraud remained the same. A representative example of an interview of one of the investors is set forth here:

21.     On or about August 12, 2008, FBI Special Agent Nicolls, DRE Sommers, and I interviewed Investor D.S., who stated the following:

        a.     Investor D.S. viewed an Advantage Financial Group ("AFG")

7

advertisement that was placed in the Sacramento Bee.  The advertisement was looking for individuals who wanted to payoff their existing mortgage and to invest in real estate with no money down.  Investor D.S. contacted the telephone number listed on the advertisement and signed up for a two-hour presentation.  While attending the two-hour presentation, Lee Loomis explained to Investor D.S. and other individuals that his company offered an investment, which allowed them to buy as much whole life insurance as possible.  These life insurance policies would be tax-free going in.  The monthly premiums on the life insurance policies would be paid from proceeds earned from purchasing investment properties in the investor's name.  Investor D.S. labeled the two-hour presentation as a "teaser" presentation.  This presentation occurred at a hotel located in Sacramento, but he cannot remember the name.

      b.     Shortly after attending the two-hour presentation, he and his wife were invited to attend a "qualifying session" at the same hotel where the two-hour presentation occurred.  Investor D.S. believed the qualifying session may have occurred at the Radison hotel, but he is not positively sure.  During the qualifying session, Loomis gave projections on income and retirement.   Investor D.S. was required to bring all of his financial paperwork to the qualifying session.  The financial documents outlined Investor D.S.'s income, what assets and liabilities he had, and a copy of his credit report.  Investor D.S. gave the financial paperwork to one of Loomis's employees and they went over the paperwork together to make sure it was accurate.   One of purposes of the qualifying session was to make sure Investor D.S. qualified for the investment program and to get acquainted with the AFG employees.

      c.     Shortly after attending the "qualifying session", he attended a two-day seminar located at a hotel in Sacramento with Loomis and his staff members.  Loomis's staff members included personal account managers, bookkeepers, employees who answered the telephones, employees who purchase the investment properties, employees associated to the life insurance program, and attorneys.  Loomis wanted Investor D.S. and the other potential investors to personally meet everyone that would be handing their transactions if they chose to invest with AFG.

      d.     During the two-day seminar, Loomis re-explained to him and others about

purchasing a whole life insurance policy and using income earned from purchasing investment properties to pay the monthly insurance premiums. Loomis told Investor D.S. and others that they would be compensated $325.00 per investment property they acquired through AFG per month. The money earned each month would be applied towards the monthly whole life insurance premiums. Loomis told Investor D.S. and others that the more investment properties they purchased, the more money they would earn which could be applied to their monthly life insurance premiums. Loomis told D.S. and others that all costs associated to buying and maintaining the investment properties would be covered by AFG. These costs, among other things, included the closing costs, homeowner's association dues, mortgage payments and property taxes. Loomis further told Investor D.S. and the others that a management company would locate and qualify tenants to occupy the investment properties. Investor D.S. believed the name of the management company was North State Management Company. The management company would also be responsible for collecting the rent from the tenants and paying the monthly mortgage payment. Loomis told Investor D.S. and others that the investment properties they would be purchasing were not owned by AFG, but in fact, were properties owned by independent individuals not affiliated with AFG. In fact, these properties were often times fixer-upper properties, or investment properties, that AFG had purchased in bulk directly from the builder. Loomis also mentioned that the loan-to-value on all of the properties purchased would be 70%-80%. Loomis emphasized that no out of pocket costs would have to be paid by the investors and all the paperwork associated in purchasing the investment properties would be handled by AFG. Loomis told Investor D.S. and others that they did not have a choice of which investment properties to purchase.

     e.     After attending the two-day seminar, he and his wife elected to invest in AFG. Investor D.S. purchased a $650,000 whole life insurance policy in his name and his wife purchased a $750,000 life insurance policy in her name. These policies were purchased through Amerus, but eventually Amerus was bought out by Aviva. The total monthly cost for both life insurance premiums is $2,600.

     f.     Between 2006 and 2007, Investor D.S. and his wife purchased four

investment properties located in Atwater, Chico, Antioch, and Illinois. Investor D.S. physically never viewed any of the investment properties before purchasing them, but he was shown pictures. Investor D.S. believed the Illinois property was purchased first. Investor D.S. and his wife attempted to purchase an additional four investment properties, but for one reason or another they did not go through. Each month, Investor D.S. was paid $325 per investment property he owned and the money was applied to his monthly life insurance premium of $2,600. The negative difference to what he paid on his monthly life insurance premium, and the monthly cost of his life insurance policy, was paid by AFG. Investor D.S. knew that he needed to purchase a total of eight investment properties in his name to cover the entire amount of his life insurance monthly premium of $2,600. In approximately December 2007, AFG notified Investor D.S. that the Chico property had to be sold. Investor D.S. knew not to question why the Chico property needed to be sold because every time Investor D.S. had a question about anything, the answer to the question would be delayed or he would be transferred to a different employee at AFG that could not give him a direct answer.

g.     Investor D.S. believed the personal information that he previously provided to the AFG employee during the "qualifying session" was used to prepare the loan applications to secure the four investment properties. Investor D.S. remembered AFG using reputable lenders to finance his investment properties to include Nationwide Lending and Countrywide Mortgage. Investor D.S. informed the interviewing agents that he had copies of the four investment properties transactions at his residence and he would be willing to provide access to them. During the time period Investor D.S. and his wife purchased the four investment properties, Investor D.S. was a self-employed as a chiropractor. Investor D.S.'s wife had an unpaid, volunteer position.

h.     On two separate occasions, Investor D.S. was required to pay the down payment of approximately $25,000 to purchase two of the four investment properties. Within days of paying the down payments, AFG repaid him the money via a wire into his bank account. The agents showed two appraisal reports for the property located at 2820 Sweeney Road, Antioch, California. The Sweeney Road property was one of the four investment properties Investor D.S. had purchased through AFG. The first appraisal was

10

conducted on March 23, 2007 by Tech Appraisers and the property appraised at $375,000. The appraisal report also indicated that the Sweeney property was pending sale at $312,000, which was below market value. The second appraisal was conducted on April 17, 2007 by Darren Fehst and the property appraised at $440,000. Investor D.S. indicated that he was surprised to learn that he purchased the Sweeney Road property directly from AFG, because Loomis previously told him and other investors that the properties they would be purchasing were from independent individuals. Investor D.S. was also surprised to learn that within an approximately 30 day time period, the Sweeney Road property had been flipped and AFG made a profit of approximately $128,000. Investor D.S. understood that AFG would be earning a profit on the investment property transactions, but not that much.

    i.  Investor D.S. would ask AFG employees questions regarding how much the investment properties he purchased had cost and how much money were they collecting in rent. The AFG employees would never answer his questions because they told him that he was not part of the decision process. Investor D.S. informed the interviewing agents that the only thing he cares about is that the whole life insurance premium gets paid each month because he has cancer. D.S. assumes because of the mortgage crisis, he owes more on the four investment properties than they are worth.

    j.  Investor D.S. did not invest in the NARAS Secured Fund #2, LLC because he did not have enough capital. Investor D.S. stated that he was not surprised to learn that Loomis had previously filed bankruptcy.

    22.  On August 13, 2008, the agents conducted a second interview with Investor D.S. The purpose of the interview was to review the real estate closing documents pertaining to the four investment properties he had purchased through AFG. A review of the loan application to secure funding to purchase the Midlothian, Illinois investment property in September 2006 revealed that Investor D.S. had a gross monthly income of $5,000 ($60,000 yearly) and his wife had a gross monthly income of $3,000 ($36,000 yearly) (the investment property was financed through Lehman Brothers Bank FSB in violation of 18 U.S.C. §§ 1014 and 1344). A review of the loan application to secure funding to purchase the Atwater, California investment property in November 2006, revealed that Investor D.S. had a gross monthly income of $10,000 ($120,000

yearly) and his wife had a gross monthly income of $3,000 ($36,000 yearly). A review of the loan application to secure funding to purchase the Chico, California investment property in January 2007 revealed that Investor D.S. had a gross monthly income of $18,000 ($216,000 yearly) and his wife had a gross monthly income of $3,000 ($36,000 yearly). Lastly, a review of the loan application to secure funding to purchase the Antioch, California investment property in May 2007 revealed that Investor D.S. had a gross monthly income of $18,000 ($216,000 yearly) and his wife had a gross monthly income of $3,000 ($36,000 yearly). Investor D.S. stated the income listed on each of the loan applications to secure funding to purchase the four investment properties had been grossly inflated. According to Investor D.S.'s 2006 tax return, he had a gross monthly income of $50,892 ($4,241 monthly) from his Schedule C chiropractor business and his wife only had W-2 wages of $9,265.80 ($772 monthly). According to Investor D.S.'s 2007 tax return, he had a gross monthly income of $49,830 ($4,152 monthly) and his wife earned no income in the 2007 tax year. Investor D.S. was surprised to learn that all four investment properties were purchased from Advantage Financial Partners ("AFP").

23.     On August 19, 2008, I queried Accurint, an IRS-CI paid subscription database, to determine what AFP paid for the four investment properties before they were resold to Investor D.S. Regarding the Midlothian, Illinois property, AFP purchased the property on or about June 23, 2006 for $180,000 and AFP resold the property on or about September 26, 2006 to Investor D.S. for the same price. Regarding the Atwater, California property, AFP purchased the property on or about August 8, 2006 for $300,000 and AFP resold the property on or about November 28, 2006 to Investor D.S. for $480,000. Regarding the Chico, California property, AFP purchased the property on or about September 11, 2006 for $195,000 and AFP resold the property on or about January 18, 2007 to Investor D.S. for $270,000. Lastly, regarding the Antioch, California property, AFP purchased the property on or about April 9, 2007 for $312,000 and AFP resold the property on or about May 9, 2007 to Investor D.S. for $440,000. Based on my training and experience in investigating mortgage fraud and due to the fact these four investment properties were purchased in a declining real estate market, it is believed that these properties were artificially inflated when AFP sold the properties to Investor D.S. In total, the investigation has disclosed that Investor D.S. paid approximately $383,000 more than what AFP paid for same four investment properties.

12

D.     Additional Investor Interview

24.    On or about August 13, 2008, FBI Special Agent Nicolls, DRE Sommers, and I interviewed Investor R.D. Investor R.D. stated that he told Scott Cavell (employee of Loomis) that he (R.D.) did not want to go through with the purchases of the two properties in Bakersfield, California, before the sale was final and the deal closed. However, the deals closed anyway without his consent or knowledge.[1] At the conclusion of the interview, Investor R.D.'s wife stated that she is suicidal because Loomis has destroyed her family's life savings.

E.     Interviews of Former/Current Employees

25.    During the course of the investigation, agents have been able to interview three former employees that worked for Loomis and two current employees that work for Loomis. These individuals held various titles to include receptionist, senior property coordinator, controller, supervisory personal account manager, and a real estate agent. Each of the former/current employees gave substantially similar accounts of the business operations of Loomis's companies and the fraud that occurred while working there. Although substantially similar, as one example of the interviews is set forth here.

26.    On or about August 19, 2008, FBI Special Agent Nicolls and DRE Sommers interviewed Dawn Powers at work at Loomis Wealth Solutions. Powers provided the following information:

a.     She is the assistant to Lee Loomis. Powers said that she began working for Lee Loomis in November, 2005, as a client bookkeeper for a company known as Advantage

---

1 After the interview, Investor R.D. emailed a copy of the email chain between him and Cavell regarding not wanting the two Bakersfield properties. In an email from Investor R.D. to Cavell dated March 27, 2008, at 3:59 p.m., Investor R.D. states, "We spoke a few weeks ago, and I requested that we step away from the Bakersfield properties. You indicated that that (sic) would be no problem since those properties were below the acceptable LTV ratio anyway. Now, a couple of days ago we received two insurance bills from State Farm for Bakersfield properties. Please advise what the status is. Did these properties close after our conversation?" On March 27, 2008, at 4:15 p.m., Cavell responds to Investor R.D.'s email and states, "No, those properties did not and will not fund. The insurance bills is [sic] from Lori Rogers at Allstate. She is trying to bill us for binding coverage on properties that never closed and therefore were not legally yours and could not legal [sic] be insured…she binded [sic] coverage when we only ask for quotes." The investigation has disclosed two investment properties located in Bakersfield, California were purchased on the same day (January 30, 2008) from the same builder, Lenox Homes, in Investor R.D.'s name, without his consent or knowledge, all in violation of 18 U.S.C. § 1028(a)(7). Thus, at the time he wrote the March 27, 2008 email, Cavell was not accurate.

13

Financial Group ("AFG") located in Glendale Heights, Illinois. In May, 2005, the name of the company changed to Advantage Financial Group Holdings, LLC ("AFGH"). Loomis changes the name of his company frequently in order to avoid paying taxes. AFG was a company controlled by Loomis. In early 2006, Loomis opened an AFG office of his company in Chico, California, with Jay Grivette. Grivette hired Karen White who worked for the company until she quit in February or March, 2008. In April, 2007, Loomis moved his company to Roseville, California.

b.      In approximately March, 2007, Loomis asked Powers to be his assistant. Powers accepted the position. In May, 2007, Powers moved with Loomis to California.

c.      Loomis pays himself a salary of $60,000. However, he has unlimited access to account funds. Loomis makes payments for three vehicles as well as his house payment from company accounts. Loomis flies first class, and he spends money freely on other people. Powers stated that Loomis has approximately 11 or 12 bank accounts. Loomis maintains a bank account at Washington Mutual which is under the name of "L and G Mortgage." This was a company set up by Loomis and Grivette that deals with real estate. Powers stated that last month, Loomis opened a new business account under the name AFGH Management. Loomis has sole signatory authority for this account, and he deposited $300,000 from a company account into this newly opened account.

d.      Essence is the name of a company in which Rich Nassiter's license was used to run mortgages in Illinois. Loomis started using this company in 2006. The company was negotiating stated income loans. If a member did not have the income to qualify for a loan, the employees created income that was not true or accurate. This inaccurate income was listed on the members' loan applications.

e.      Currently the company uses Nationwide Lending Group ("NLG"), which is controlled by John Hagener, who is Loomis's father-in-law. John Hagener has money invested in the LLC and takes direction from Loomis. John Hagener set up five bank accounts at Bank of America under the name Advanced Lending Group ("ALG") in order to keep the money separate.

f.      There were rumors around the office that another team of employees that worked for Loomis under NLG was "not so compliant." Chris Warren and Scott Cavell were the two

14

"leaders" of this team of "not so compliant" employees. Warren owned a company called Saige, and he bragged about "single handedly putting the mortgage industry where it is today." Warren also created his own title company within Loomis Wealth called "Superior Escrow Closings." Warren and Jason Sanbei had an illegal copy of Adobe that they used to change pay stubs, tax returns, and asset documents. Warren also "signed trailing documents," which were documents that came in after the close of escrow. Warren made $270,000 per year, and he set very high salaries for the members of his team, who were also good friends of his. Loomis fired Warren for "not being on the up and up" and "creating exposure" for Loomis Wealth, as well as creating his own title company without Loomis's knowledge.

 g.  The office building in Roseville was not purchased by Loomis himself. Loomis has bad credit, and therefore, his name "is not on too much." In fact, Stony Creek LLC, is officially the owner of the office building. Stony Creek was a development that Loomis was going to start. Stony Creek LLC is comprised of four individuals, John Hagener, John Dygdon, Harry Sommer, and Ken Hong. These four individuals signed for the building, but Loomis did not. $600,000 of investor money was used as the down-payment for the purchase of the office building, which was approximately 25% of the sale price of $2 million.

 h.  The company has cash flow problems. The problems became apparent in approximately February, 2008. Loomis was not able to pay health insurance premiums for his employees for May or June, 2008. The company started a policy with a new provider as of July 1, 2008, and the premiums were paid for the months of July and August, 2008 with the new provider. The company has no money and, therefore, will not be able to fund the payroll checks which are supposed to go out to employees on Wednesday, August 20, 2008. She is still friends with Karen White, who is a former employee of Loomis. White was in charge of finances, and when she entered information into Quickbooks, she made notations for what the debits were being paid out. White left the company because the payroll taxes were not being paid.

 i.  One aspect of the company she feels is fraudulent involves Loomis's "Assurance Plan." This plan is supposed to guarantee that members receive a monthly assurance check in the amount of over $300 for each property owned by the member. The total amount owed to the member from this "Assurance Plan" is supposed to be paid toward the members' life insurance policies. The amount of the life insurance policy each member purchased was based on the

15

number of properties the members "qualify to purchase." The money that the members receive for each property from this "Assurance Plan" is supposed to be paid toward the life insurance policy as "a non-recourse loan." The number of properties that members qualified to purchase was set by Loomis when he put together the member's financial plan. Up until October or November, 2007, Loomis himself put together all of the financial plans for every member even though he was not licensed as a Certified Financial Planner (CFP). As of October or November, 2007, Loomis had other employees start to put member financial plans together. This was done intentionally by Loomis in order to "keep his hands clean."

j.    The life insurance policies sold to the members are now through a company called Aviva. Loomis gets a substantial commission on all annual premiums paid up front for each policy. The money received from the life insurance policy went into an account titled the Lisa Loomis Agency.

27.    On or about August 21, 2008, FBI Special Agent Nicolls and DRE Sommers conducted a second interview with Powers. According to Powers, before the second interview, on August 20, 2008, Loomis advised Powers that he did not want her to meet with agents for the second interview. Powers informed the interviewing agents that Paul Hagener was outside Powers' office during the first interview and made frequent calls to Loomis. Powers stated that Hagener advised Loomis that the FBI and DRE agents were in Powers' office for approximately three hours. In pertinent part, Powers stated the following during the second interview with agents:

a.    Over the last several years, Loomis has created and/or done business, at one time or another, under the following entities: Financial Executive Group ("FEG"); Advantage Financial Group, Inc. ("AFG") and AFG Management, Inc; Advantage Financial Partners ("AFP") and AFP Management, Inc; Advantage Financial Partners of California ("AFP of CA") and AFP of CA Management, Inc; Kankakee Meadows Development ("KMD 1"), which is a business venture between Loomis and his previous business partner, Jeff Stone; G & L Real Estate (stands for Grivette & Loomis Real Estate); L and G Mortgage (which stands for Loomis and Grivette Mortgage); Loomis Wealth Solutions, LLC ("LWS") and Loomis Wealth Solutions Management Inc,  (a management company Loomis created but apparently never used); Advantage Financial Group Holdings LLC ("AFGH") ; AFGH Management LLC; Stony Creek

16

LLC; and lastly, Placer Buy Out LLC. AFGH has a levy notice filed against the company. Therefore, Loomis established AFGH Management Inc.   Loomis prefers to establish management companies simultaneously because he likes the management company to make the decisions instead of a single person. The name, AFP Management Inc, which was run by Rob Block, recently changed its name to Safe Property, Inc. AFP of IL employee, Randy Rantz, was responsible for this change.

      b.     North State Property Management ("NSPM") is a separate entity not owned by Loomis, yet Loomis has control over this company. NSPM operated out of Loomis' Chico office until the company moved to Loomis' Roseville office sometime in 2007. NSPM manages the members' investment properties. NSPM is responsible for paying the monthly mortgage payments for members' investment properties. In July 2008, Krater sent out $1.2 million to $1.5 million in mortgage payments. However, NSPM's WAMU bank account did not have the sufficient funds to cover these checks. NSPM only collected $80,000 to $150,000 in rent from tenants. Therefore, the mortgage payment checks bounced, which upset many members. Some members are 60 days late with their mortgage payments since some of the June mortgage payments were also returned for insufficient funds. Furthermore, mortgage payments for August have not been paid. Some members may have their investment properties foreclosed upon in the near future.

      c.     Powers believed that Grivette and Ripley spoke to appraisers in order to ensure that properties appraised at the appropriate value. Grivette and Ripley needed to know the appraised value of a property before attempting to sell the property to a member. This was an important step to ensure Loomis' company made a profit. Appraiser Darren Fehst of Appraiser Networking Services was predominately used to appraise the properties. Even though he lived in Southern California, Fehst or one of his employees would appraise properties in Northern California. Appraisers were paid by AFP of CA's business debit card from WAMU bank.

      d.     More recently, Loomis yet again changed the method in which the company used in order to purchase investment properties for members. Loomis had a partnership agreement with a company called LW Premier Holdings ("LWPH"), a company primarily run by Michael Llamas and Pete Woodward, located in Tracy, California. LWPH recently changed their name to Cobalt One. Per the agreement, LWPH would negotiate deals with builders for the sale of

17

bulk properties. In turn, Loomis' company would secure members to the purchase these properties. LWPH did not want a formal agreement in writing. There were no joint venture agreements between Loomis' company and the builders. If LWPH successfully negotiated a deal to purchase properties in bulk from a builder, LWPH and LWS would split the dollar amount 50/50 from the discounted price verses the Loomis member's purchase price. This was referred to as a "referral fee." Loomis' company mostly accepted deals that were $.60 on the $1.00. Members were not aware of the major difference between the discounted price that was paid by LWPH compared to the members' purchase price. This information was also not disclosed to the lenders. In fact, the line item on the HUD 1 reflects a fee to LWPH, but does not disclose that LOOMIS receives 50% of that fee paid to LWPH.

e.      LWPH and Loomis' company successfully completed several bulk purchases over the past year. LWPH primarily dealt with Sunvest in securing these properties. Sunvest is the parent company of the following subsidiaries: JH Builders, EHA Homes and Desert Hot Springs. In June or July, 2008, Loomis' company received approximately $120,000 of referral fees for the sale of six homes from Seeno Homes in Antioch, California. One transaction actually generated a $170,000 referral fee. This was completely independent of negotiations with LWPH.

f.      Michael Llama secured properties located in the Eaglewood Subdivision, commonly known throughout the Loomis office as "Eagle Hood." The properties were "disgusting and terrible" and not worth the $200,000 to $250,000 Loomis' members paid. Tenants in these properties are paying approximately $400 per month in rent. In order for the properties to appraise at $200,000 to $250,000, Llamas made it appear that two of the properties were purchased for that amount. This allowed the appraisers to use those comparables for the member's appraisal reports. However, the comparables were not good because Llamas never purchased the two properties, and the properties were still in Eaglewood's name.

g.      Another fraudulent bulk purchase occurred in Bakersfield, California. Even though the builder had not completed several properties, Chris Warren, Jason Sanbie and Scott Cavell of Nationwide Lending Group ("NLG") cut and pasted photos of completed homes on appraisal reports for uncompleted homes, using their illegal Adobe software. Powers does not believe Loomis was aware of this.

18

     h.     One particular builder, Ranchwood, was in negotiation with LWPH for the purchase of bulk homes. Loomis' company was to provide members who were in a position to purchase the homes. The deal fell through because the properties were unable to appraise at an acceptable value. LWPH and Loomis' company are currently in litigation with Ranchwood since the deal was not finalized as originally agreed. In April 2008, Ranchwood sent Loomis' members "notices of default on intent to buy." Members were upset about the notice and called Loomis' company regarding the letter.

     i.     Although the NARAS Fund appears on paper to be liquid, the fund is depleted. Currently, there is approximately $1,700 in the account. This information was not disclosed to the investors. Some of the money from the NARAS Fund was used for down payments for member investment properties, but most of the money was paid to Loomis Wealth Solutions ("LWS") and AFGH for operating expenses. Other money from the fund was also paid to North State Property Management ("NSPM") for member mortgage payments.

     j.     Powers verified funds were in the members NARAS accounts when lenders requested verification of deposits ("VODs") in order to secure financing for the purchase of investment properties. Even if a member was not an investor in the NARAS Fund, Powers, at the direction of Loomis, signed the VODs on behalf of the members that did not invest in the NARAS Fund. Loomis told Powers to create an account for a member, even if the member did not invest money in the NARAS Fund. By signing the VODs, Powers acknowledged the members had money invested in the NARAS fund.

     k.     Powers wrote checks from the NARAS Fund for the down payments of members' investment properties even though the funds were not in the account at the time she signed the checks. Powers felt this was acceptable because at the close of escrow when those checks would be negotiated, funds would also be wired back into the account for the NARAS Fund from LWPH. Therefore, "the money was always floating." The money received from LWPH that went into the NARAS Fund was money due to the company from the "referral fees." The money that was wired at the close of escrow from LWPH was split into the NARAS account and the account for LWS.

     l.     Loomis advised her that the company will receive a huge payout on September 22, 2008. This payout is a result from the new business model Loomis is trying to implement

19

with the assistance of Jim Stryker of the State of Washington.   The new business model deals
with commodities and jet fuel.

     F.     Additional Employee Interviews

     28.     Former employee Tammy Ripley stated she started in 2006 as a receptionist for
the company in Chico, but quickly rose to be a senior property coordinator.  Ripley stated that at
times, the company buys new houses from developers such as KB Homes. KB Homes would
kickback to the Loomis at least 20 to 30 percent.  Ripley stated that she is familiar with at least
three deals of at least $20,000 that were kicked back.  One of them was for $42,000.  Ripley
stated that one of the principal frauds is that AFP sells the investors houses for much inflated
prices.  AFP is able to do this because it demands very high appraisals from the appraisers that it
uses.  AFP has known to use appraiser Darren Fest because he has been know to inflate
appraisals for AFP.  Ripley told Fest that if he didn't give AFP the values they wanted, AFP
would use other appraisers.  Ripley would tell Fest that AFP needed a certain value and it was
done.  Ripley stated that some of the investment properties the investors were purchasing were
located in depressed neighborhoods, but investors were not aware of this because the properties
that they were purchasing were not located in their area.  Ripley said that another area of rampant
fraud was in the area of verification of deposits. Although many of these people had considerable
money, frequently there was not enough to cash in the accounts at the right time to show the
lenders on their verifications of deposits. Therefore, it was necessary to wire money into
investors' accounts, get a printout from the bank, and then wire the money back into Loomis'
bank account. Sometimes it would take getting new investors with fresh cash to be able to fill up
these other accounts with unnecessary money to show on the verifications of deposits from the
banks for new investments.  Ripley said that another area of rampant fraud was in the area of
verification of deposits.  Although many of these people had considerable money, frequently
there was not enough to cash in the accounts at the right time to show the lenders on their
verifications of deposits.  Therefore, it was necessary to wire money into investors' accounts, get
a printout from the bank, and then wire the money back into Loomis' bank account. Sometimes it
would take getting new investors with fresh cash to be able to fill up these other accounts with
unnecessary money to show on the verifications of deposits from the banks for new investments.

Ripley said that the down side for AFP is when they get the house appraised so high, the mortgages are also inflated. For this reason they cannot pay the mortgage payments fully with the rent that they obtain from renters.

29.     Additional pertinent facts obtained from former employee Karen White include the following. White stated that she worked for Advantage Financial Partners ("AFP") from February 2006 through February 2008, as a controller in the Chico, California office (Dawn Powers took over former employee White's position). White stated that she left the company because she suspected the business was engaged in improper dealings. White stated that the purpose of AFP was to acquire properties to sell to "members". White said that she believes there is nothing left of AFP except a lot of debt. White said that Loomis Wealth Solutions ("LWS") identifies and purchases properties that are then resold to "members" at higher prices. White said that Loomis also created the NARAS Fund. The NARAS Fund is run by Loomis' father-in-law, John Hagener, and is registered with the SEC. The NARAS Fund is a "kind of savings account that was to be used for real estate investments but could also be used for operating expenses". The fund was supposed to bring a 12% - 15% return to investors. According to White, Loomis has stopped paying his taxes and he owes over $800,000 in back payroll taxes.

G.     Interview of Lee Loomis

30.     On August 15, 2008, Loomis was interviewed at his office. As stated above, according to the NARAS Secured Fund #2 LLC WAMU bank statements, between in or about August 2007 through in or about July 2008, investors invested in excess of $9.6 million into the fund. Loomis stated that he is planning 10 new private placement memoranda offerings under Regulation D in order to try to raise money to turn the company around.

31.     Loomis stated that the monthly statements for NARAS Fund are sent to the investors showing dollar balances. But Loomis admitted that these dollar balances are not reflective of liquid cash or other deposits. Instead, he explained that they were based on asset valuations, which, in turn, were based on appraisals of new homes purchased in his builder bailout scheme. Loomis stated the NARAS Fund monthly statements are mailed through the United States mail to the investors.

21

32.     During his interview, Loomis falsely claimed the NARAS Fund contained a bank account balance of approximately $600,000-$800,000.   In fact, my review of the bank records shows that the NARAS account only contained approximately $14,000 on July 31, 2008. Moreover, Loomis claimed he had enough cash to continue operations for at least three more months.  But according to Loomis's letter to his members dated August, 13, 2008, he has suspended all withdrawals from the fund and is no longer paying life insurance premiums or mortgage payments.

33.     Loomis claimed that he collects $700,000 a month in rents, but has $1 million per month in mortgages to pay.  This statement by Loomis contradicts a statement made in his letter to members dated August 13, 2008.  In Loomis's letter, he states that the property managers have not done an effective job occupying properties, thus high vacancy rates have significantly impacted cash flow.  As stated above, during the second interview with Dawn Powers, she stated Loomis wanted her to ask employees to defer their paychecks because there was not enough money in the account to cover the pay checks.

34.     In his interview, Loomis blamed people below him for questionable mortgage practices.  For example, Loomis claims he caught AFP employee Chris Warren signing a document on behalf of a member without the members consent and using double HUD-1 Settlement Statements.  However, Loomis would take Warren along to negotiate big deals because Warren had knowledge of how to get mortgage applications underwritten.  Loomis stated that he hired Warren for his banking knowledge and paid him a yearly income of $220,000.  Loomis's close association with Warren after knowledge of Warren's fraudulent conduct shows that Loomis had knowledge that fraud was being conducted out of his company.

35.     Loomis admitted to the agents that he pays himself a yearly base salary of $70,000, but in the 2007 tax year, Loomis took distributions of between $300,000 to $400,000 from the company.  Loomis believed he currently takes a $20,000 per month distribution from the company.  Loomis stated he has "many loans" from the company to himself.  Even though the scheme is failing, our investigation shows that Loomis continues to spend large sums of investor money on his lavish lifestyle.

36.     During the interview, Loomis demonstrated detailed knowledge of the Option Contract/Joint Venture scheme with builders in his builder bailout scheme.  Loomis was very

22

evasive and nervous when pressed on whether the individual home purchasers were ever told what the true purchase price was.

37.     Loomis admitted to the interviewing agents that he was aware that the FBI searched Garret Gililland's residence in Chico.[2] Loomis admitted he had personally met with Gililland and Jay Grivette at his office in Roseville after the Gililland search. Loomis was also aware that Gililland gave a statement to the FBI. Lastly, Loomis admitted after the search of Gililland's residence on or about June, 25, 2008, somebody suggested to him to "wipe and clean the computers." Loomis would not tell the interviewing agents who asked him to "wipe and clean the computers."

38.     Near the conclusion of the interview with Loomis, he gave the interviewing agents a tour of the office. Loomis pointed out unoccupied cubicles that used to be occupied by "mortgage helpers" that would interface with the banks. During the tour I also observed a huge whiteboard that, according to Loomis, contained the Florida Sunvest deal for 50-plus homes with Warren, Grivette, and Gililland. The whiteboard indicated Lender Services Direct ("LSD") was the escrow company handling the Florida Sunvest deal. Moreover, during the tour, I observed at least eight workstations/offices that had computers. Lastly, Loomis pointed to a room next to the front entrance that, according to Loomis, contained servers for the computer network.

39.     At the conclusion of the interview, Loomis attempted to get the interviewing agents to agree that during our investigation if we found any fraud that we needed to bring it to his attention so he could correct the problem.

## H.     Interview of New Home Builder

40.     Rhett Salha, representing himself as without official title but equivalent to CFO of Ranchwood Homes (Ranchwood), and Dana Howell, Sales and Marketing Manager of Ranchwood, and Attorney Steven G. Rau, Esq., of McCormick Barstow LLP, Attorneys at Law, Fresno, California, were interviewed on or about August 5, 2008. Rau represents Ranchwood.

2 Garret Gililland is involved with Jay Grivette in mortgage fraud in Chico. Gililland was recently indicted in this district. Both Gililland and Grivette were working with Loomis and Christopher Warren on a large builder-bailout scheme in Orlando, Florida, when Gililland's house was searched on June 25, 2008. The search was conducted under a federal search warrant authorized by Judge Kimberly J. Mueller.

23

41.     On or about November 1, 2007, Ranchwood was approached telephonically by LW Premier Holdings, LLC ("LWP"). The representatives of LWP who initially approached Ranchwood were Melissa Sharrick from LWP and Mark Utman from Park Place Partners, who advised Ranchwood that LWP was calling home builders in general because they sensed the market was backing up. Utman said that they were interested in bulk purchases of about 50 unsold new homes.  Ranchwood negotiated primarily with Sharrick, who was the property acquisition specialist for LWP.

42.     The discount amount for the 48 homes to be purchased was finally agreed on a 32.5% discount price applicable to all homes sold to LWP in the bulk sale.  A written agreement was signed that stated that if LWP assigned a home sale to a third party, LWP would receive an "assignment fee" similar to that of a finders' fee of upwards of 32.5% for homes sold to third parties.

43.     Initially, Ranchwood had no idea there would be any other buyers other than LWP. At some point, there was a transition from LWP buying the homes in bulk, to individuals buyer's buying the individual homes directly from Ranchwood.  Sharrick told Ranchwood that LWP would provide Ranchwood with a list of buyers that would purchase each home. Therefore, 48 individual contracts were prepared. This was a substantial change from the initial agreement, and Ranchwood became very nervous.  Ranchwood became nervous from both a business perspective and a moral perspective.

44.     On the business side, the feasibility of successfully completing 48 individual sale contracts was in doubt. On the legal side, Ranchwood worried that the homes were being sold to the buyers at a significantly higher price than LWP had negotiated with Ranchwood. Ranchwood had growing concerns that LWP would defraud the individual home buyers, and therefore decided the individual buyers needed to be made aware of the true price. Without LWP's prior knowledge, Ranchwood sent disclosures of the true price directly to the 48 purchasers.

45.     LWP became extremely angry with Ranchwood when it learned from its investors what Ranchwood. Sharrick at LWP advised Ranchwood that Ranchwood raised "a real dust storm" with the buyers.  Sharrick at LWP said LWP's clients were savvy and "sophisticated investors" who did not have time to deal with these details. Sharrick informed LWP that these

24

sophisticated investors had close relationships with financial advisors who had advised them to purchase these homes at the "Asking Price." Sharrick indicated that Ranchwood's action of notifying the buyers of the true purchase price was jeopardizing the relationships between the investors and their financial advisors. Sharrick said that LWP was busy doing "damage control" with the individual purchasers.

46.     When questioned about its business model, LWP explained that the sale of the 48 homes was an investment deal for LWP and that the houses were not going to be rented, but sold to people who could not qualify for a conventional loan. The homes would never be on the rental market, according to Woodward. Salha and Howell confirmed that they never saw any mortgage applications from the individual buyers.

47.     Ranchwood confronted LWP about its inability to perform. According to Sharrick, LWP was so busy that it was unable to keep up with everything. LWP was also not used to sellers like Ranchwood asking so many questions. To reassure Ranchwood with respect to the earnest money, Sharrick provided photocopies of copies of 48 individual checks for $5,000. All the checks appeared to be photocopied and written on bank account of NARAS on bank in Roseville. They were signed by "Dawn Powers."

48.     Ultimately, the deal between Ranchwood and LWP fell apart when LWP failed to perform and failed to meet multiple deadlines. LWP produced some appraisals and did the walk-throughs, but by the end of the year, Ranchwood only knew of a couple of buyers of LWP who qualified for the loans.

49.     Months later, Lee Loomis and Jack Wes Haga of Proliance, Inc. contacted Ranchwood. They promised the deal could be salvaged and said that they were the real powers behind LW Premier Holdings. Despite this promise, the deal never progressed. Ranchwood is currently involved in arbitration with LW Premier Holdings over this deal.

I.      Financial Records

50.     A summary of bank records associated to NARAS Secured Fund #2, LLC is described below. To date, I have only received the bank statements for this bank account. The pending source documents related to this bank account and approximately twenty-two other bank

25

accounts associated to Loomis and others have been ordered from the Washington Mutual Bank Subpoena Department.

51.     I obtained records of a Washington Mutual Bank account, in the name of NARAS Secured Fund #2, LLC, for the period August 29, 2007 through July 31, 2008. The signature card reflected that the account was opened on or about August 29, 2007. The authorized signers of the bank account number John H. Hagener and Dawn C. Powers. The monthly bank statement mailing address is 2424 Professional Drive, Roseville, California. According to the bank statements, between August 29, 2007 and July 31, 2008 (less than a one year period), there were approximately $9,645,899.25 deposits into the account and $9,631,607.59 withdrawals from the account. During an interview with Loomis on or about August 15, 2008, he informed the agents that the NARAS bank account had a balance of approximately $700,000-$800,000, but in fact, as of July 31, 2008, the account only had a balance of approximately $14,475.35.

52.     Investors provided to the agents a copy of their most recent monthly NARAS Secured Fund #2, LLC statement. These statements were for the time period of July 1, 2008, through July 31, 2008. Investor R.Y. also provided a copy of the envelope that the monthly statement arrived in. A review of the envelope revealed that the statement was mailed through the United States mail from the address of NARAS Secured Fund #2, LLC, 2424 Professional Drive, Roseville, California 95661. A review of the monthly statements revealed as of July 31, 2008, Investor D.T. had an account balance of $110,000, Investor R.Y. had an account balance of $90,650.33, and Investor R.D. had an account balance of $365,494.93. In total, these investors had an account balance of approximately $566,145.26. As indicated above, according to the Washington Mutual Bank for the NARAS Secured Fund #2, LLC bank account, the ending account balance on July 31, 2008 was approximately $14,475.35. If these investors wanted to withdrawal their money from the fund all at the same time, there would not be enough money in the account to cover their requests.

J.     Investor Payments

53.     Based on my training and experience, I know that it is the hallmark of a Ponzi scheme for the subject to make periodic payments to investors consistent with the promised rate of return, despite the fact that such payments cannot be justified based on the performance of the

26

investment, if any. These payments are usually alleged to be the capital appreciation of the investor funds but are, in fact, lulling payments made to investors so as to not arouse suspicion and to keep investors from asking for a refund or withdrawal of their principal. Typically, as here, the investment is not appreciating and the payments are made from new investor money .

K.      Current Status of Loomis Wealth Solutions

54.     On or about August 20, 2008, I obtained a letter purportedly signed by Lee Loomis, dated Wednesday, August 13, 2008. The letter was written on Loomis Wealth Solutions stationary. The letter states that in pertinent part:

- "Over the past eight years, our company has grown to service more than 250 families all over the country."
- "Our latest challenge has been the recent downfall of the mortgage industry."
- "For a start, the company's liquidity, like that of the housing industry - or that matter, the economy - has fallen lower than required for business operations."
- "Secondly, our property managers have not done an effective job occupying properties. High vacancy rates have significantly impacted cash flow and especially our ability to offset revenue streams against fixed obligations. In short, property payments have been a real struggle to meet while property values have declined."
- "We have the opportunity now for an alternate source of revenue that will still allow us to participate in the real estate market, but will get us out of debt business. The new plan requires spending our limited resources on new investment platforms and moving away from our existing business model."
- "What is the plan? Stay with what we have been doing (property acquisition) through August. Going forward, we are moving out of the debt business since it is too volatile to be in right now and will be funding future real estate projects through our own capital sources. This means we will own capital resources and pay cash for any future properties."
- "These investments take time and are governed by market supply and demand. We need to engage our entire organization - all of our members - to understand, and hopefully be

27

patient with us until we can provide results related to our new organizational goals and priorities."

- "Let me be clear on this point in particular - we are expecting revenue - there is just not a clear timeline for this revenue. In the meantime, we may be late on some of our obligations, but we will make payments as soon as our diverted funds meet with success."

55.     Attached to the letter were four pages of various topics with bullet points under each topic. These topics included mortgages, assurance income/life insurance, NARAS, properties, and additional concerns. Under the topic "mortgage", Loomis informs the members that July, August, September, etc. mortgage payments will have to be paid by the members, not Loomis. Loomis informs the members that a single late mortgage payment will "dramatically" drops the member's credit score. Loomis informs the members that mortgage companies wait 120 days before filing a "Notice of Default" and then three months before the "Notice of Sale" proceedings. Loomis informs the members that he hopes to have the new business model in place long before this. Under the topic "assurances income/life insurance, Loomis informs the members that he has made a difficult decision to halt assurance payments. Under the topic "NARAS", Loomis informs the members that the fund is currently heavily invested in 2nd mortgages on properties, but there is a current freeze on any withdrawals from the fund.

56.     Based on my training and experience investigation Ponzi scheme, this letter is a ploy to keep the investors optimistic and at bay. Within the letter, Loomis informs the members he has a new investment platform that will get them out of this mess. In fact, however, the scheme is collapsing.

L.     Use of the Mails and Interstate Wires

57.     The investigation has disclosed that according to statements made by the three out of the four investors, their monthly NARAS Secured Fund #2, LLC, statements were mailed to the investors via the United States mail. During an interview with Loomis on or about August 15, 2008, he corroborated this information.

58.     Based on my training and experience investigating mortgage fraud, several interstate wires are committed during the funding of a loan and during the closing of an escrow.

When an escrow company opens escrow, a lender will wire funds into the escrow account that has been established in the names of the buyers and sellers. These lenders are located through the United States. Typically, the wire sent from the lender to the designated escrow company crosses state lines. Additionally, in order for the property to close escrow, the existing liens associated to the property need to be paid off. The most common lien on the property is the existing lien held by the financial institution or private lender. Typically, the existing liens held by these parties are paid off via a wire from the escrow company.

### M.     Use of Computers

59.     Loomis maintains at least one sophisticated website, www.loomiswealth.com. On or about August 20, 2008, I visited the website and reviewed the contents of the website. Because this website is posted on the internet, the information contained on the website is thereby transmitted in interstate commerce. The review revealed there were several tabs that the public could access to include the home page, about us, FAQ (frequent asked questions), testimonials, literature, contact us, and member sources. As state above, agents interviewed Loomis at the LWS office located at 2424 Professional Drive, Roseville, California. Near the conclusion of the interview, Loomis gave a tour of the LWS Roseville, California office. During the tour, I observed at least eight workstations/offices that had computers. Files stored on computers used in businesses used to promote frauds frequently contain records of emails, drafts of sales pitches, correspondence with investors and coconspirators, and files containing investor information. Loomis confirmed that his company maintains a server on-site and hosts it own email. I request authority to image that server and search all of the seized email messages and attachments contained therein for evidence of the fraud.

### N.     Permeated by Fraud

60.     Based on the investigation to date, I have probable cause to believe that Lee Loomis, John Hagener, and others are conducting a scheme to defraud investors in violation of 18 U.S.C. §§ 1341, 1343, 1344, 1014, 1349 , 1956, 1957 and 1028(a)(7), and that evidence of this fraudulent scheme is likely to be found at the places to be searched. I also have probable cause to believe that the following entities conduct no legitimate business and that the sole

29

purpose of the business is to perpetrate the scheme to defraud set forth in this affidavit: Loomis Wealth Solutions, Advantage Financial Group ("AFG"), AFG Holdings, LLC, Advantage Financial Partners of California LLC, ("AFP-California"), Advantage Financial Partners of Illinois LLC ("AFP-Illinois"), AFP of Utah, Nationwide Lending Group, NARAS Secured Fund LLC, NARAS Secured Fund #2 LLC ("NARAS Fund"), Lismar Financial Services LLC, North State Property Management, Green Ivy Property Management, Stony Creek Partners, LLC, Essence Financial, Lender Services Direct, Inc., G & L Real Estate, and L & G Mortgage Company. I have probable cause to believe that the above mentioned entities are merely a scheme to defraud and that all of the business's records are likely to be evidence of criminal activity and, therefore, subject to seizure.

O.    Premises to be Searched

61.    As stated above, on or about August 15, 2008, agents conducted an interview of Lee Loomis at the business address of 2424 Professional Drive, Roseville, California, more particularly described in Attachment A-1. During a break in the interview, Loomis gave agents a tour of the office and pointed out various documents to include client files. Additionally, each month, Loomis mails all investors their company magazine called, "True Wealth." The return address listed on the magazine is 2424 Professional Drive, Roseville, California. Also as stated above, the month bank statements for the NARAS Secured Fund #2, LLC bank account, held at Washington Mutual Bank, are sent to the address of 2424 Professional Drive, Roseville, California. Lastly, as stated above, a review of the envelope received from Investor #2 that contained his monthly NARAS Secured Fund #2, LLC monthly statement revealed a return address of 2424 Professional Drive, Roseville, California.

62.    During an interview with Loomis on or about August 15, 2008, he informed the interviewing agents that he also works out of his residence located 7915 Shelborne Drive, Granite Bay, California. According to Accurint, on or about July 26, 2007, Loomis and his wife, Lisa, purchased the real property located at 7915 Shelborne Drive, Granite Bay, California, more particularly described in Attachment A-2, for $1,950,000. Also according to Accurint, on or about April 2, 2008, a notice of default was filed on the Shelborne Drive property. Lastly,

30

according to Accurint, on or about May 5, 2008, Capital City Drywall, Inc. filed a mechanic lien on the Shelborne Drive property.

## V. ITEMS TO BE SEIZED

63.    I have participated in the execution of at least 100 federal and state search warrants involving the seizure of evidence, fruits and instrumentalities of crimes including, but not limited to, telephone bills, personal telephone books, photographs and letters that have identified coconspirators and others involved in the criminal activity; records pertaining to the purchase of real and personal property; bank records; escrow records; credit card records; tax returns; business books and records; and computer hardware and software.

64.    From my training, experience and discussions with experienced white-collar crime investigators, I know that it is common for individuals who are running businesses (whether lawful businesses, wholly illicit businesses, or lawful businesses which commit unlawful activities related thereto) to maintain records related to the businesses and their activities including, but not limited to the following:

a.    Articles of personal property tending to establish the identity of persons in control of the premises searched, that include utility bills and receipts, rent receipts, mail envelopes, identification and/or travel documents, vehicle registration and ownership information, passports, airline tickets, travel documents, and other items which establish personal identification.

b.    Invoices, statements, receipts, contracts, agreements, Western Union and other financial wire transfer service receipts, credit card receipts, money order receipts, records/receipts reflecting payments.

c.    Address books, files and records evidencing the identity of customers, clients and associates; business correspondence, facsimile records, correspondence to/from overnight courier services, accounting ledgers and journals; work papers, customer lists, personnel records, pay records.

d.    Bank, financial institution, and investment account records, check books, statements, deposit slips, canceled checks, customer checks, cashier's checks, loan records, financial statements, credit reports, records of wire transfer, treasurer's checks, tax returns and

31

return information.

    e.    Records of corporations, partnerships, and joint ventures.

    f.    Any and all documents and materials relating to the purchase or sale of real estate including loan files, title company records, mortgage loan applications, correspondence, escrow records and instructions, lender verifications of employment records, HUD-1s, copies of appraisals, invoices for work or credits claimed, and deposit checks for properties purchased by or on behalf of members or client investors.

    g.    All periodic account statements sent to members or client investors.

    h.    All financial plans, worksheets, copies of tax returns, Forms 1099, Forms W-2, pay stubs, bank statements, and other financial records of the members or client investors who are believed to be clients.

    i.    Any documents, records or materials that evidence newspaper, internet or other advertizing or solicitation of tenants to rent residential properties.

    j.    Shipping documents/receipts to or from Federal Express, Airborne Express, United Parcel Service, the United States Postal Service, and opened and unopened United States Mail and/or items shipped by other courier services.

    65.    From training and experience I also know that persons engaged in financial crimes, including fraud schemes, frequently retain records of their financial activities in various places under their control including their residence, place of business, rented storage units, or vehicles. Records of this kind are also often stored on computer media.

    66.    Persons engaged in financial crimes, including fraud schemes, often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time. The Ninth Circuit and other courts have held that, where there is an ongoing criminal business, or where the evidence is of a nature that it would be kept long after the criminal activity has ceased, the passage of long periods of time will not make the evidence supporting the issuance of a warrant stale (See United States v Greany, 929 F2d 523 (9th Cir. 1991)).

    67.    There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g. financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets,

personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The criminal offender may also be under the mistaken belief that he/she has deleted, hidden or further destroyed any computer-related evidence, but which may be retrievable by a trained forensic computer expert

## VI. COMPUTER DATA

68.     Based upon my knowledge, training and experience, and my consultation with other criminal investigators including fellow IRS-CI agents with specialized training related to computers, I know that computer files or remnants of such files (including e-mails) can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on

33

when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

69.    Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, thumb-drives, personal data assistance, cellular telephones, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.    Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.    Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c.    The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5

34

million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

        d.      Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime. These steps may require agents to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence requested to be seized.

## VII. COMPUTER SEARCH PROCEDURE

        70.     In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

        a.      Any computer equipment, software, and storage device capable of being used to commit, further or store evidence of Mail Fraud, Wire Fraud, Bank Fraud, Conspiracy, Money Laundering, Engaging in Monetary Transactions Over $10,000 in Property Derived from Specified Unlawful Activity, and Identity Theft, in violation, respectively, of Title 18 United States Code, Sections 1341, 1343, 1344, 1349, 1956, 1957, 1028;

        b.      Any computer equipment used to facilitate the transmission, creation,

display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

    c.    Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, thumb drives, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, personal digital assistants;

    d.    Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

    e.    Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

    f.    Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

    g.    Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

## VIII.   POTENTIALLY PRIVILEGED DOCUMENTS

71.    It is possible that attorney-client privileged documents may be found in the search locations. Therefore, any document that appears on its face to be attorney-client privileged material will be placed in a separately held box, to be inventoried separately. At a later date, a person or persons will conduct a privilege review of those documents in accord with applicable law. Additionally, Loomis informed agents that one attorney, Bill Smith, has an office within the suite of offices at 2424Professional Drive in Roseville. Loomis said that this attorney provided estate planning services to investors. Powers confirmed Smith's role was limited to estate planning for people who invested in this program. We will not search this attorney's office. Additionally, any document sent to him or authored by attorney Smith that are found elsewhere in the suite of offices shall be placed in the separately held box of potentially privileged documents.

36

## IX.   CONCLUSION

71.   Based on the facts stated above. I have probable cause to believe Lee Loomis.
John Hagener. and entities they control are operating a multi-tiered Ponzi scheme in violation of
the federal Mail Fraud. Wire Fraud. Bank Fraud and Identity Theft statutes. This scheme
encompasses. among other things. (1) material misrepresentations to investors of the true cost of
residential real estate purchased in their names. (2) the use of fraudulent account statements to
lull investors into a false sense of security. and (3) the manufacturing of false financial
information to lender banks in an attempt to obtain mortgages. The investigation to date has
revealed that the Loomis-related entities conduct no legitimate business purpose. Indeed. based
on facts obtained to date. and on my training and experience. I believe their sole purpose is fraud.

## X.   SEALING ORDER

72.   The criminal investigation regarding Lee Loomis and others is continuing. We
contemplate a number of additional interviews. subpoenas. and possibly grand jury testimony of
witnesses in the near future.  Disclosure of the contents of this affidavit at this time could
seriously impede the continuing investigation and prosecution by prematurely disclosing the
details of the Government's investigation.  This could potentially cause subjects of the
investigation to flee. destroy evidence. or intimidate and attempt to corruptly influence potential
witnesses in the case.  So. the government requests that this affidavit be ordered sealed until
further order of the court.

Christopher S. Fitzpatrick
Special Agent
Internal Revenue Service–Criminal Investigation

Approved as to form:

Russell L. Carlberg
Assistant United States Attorney

Subscribed and sworn to before
me this __25TH__ day of August. 2008.

Dale A. Drozd
United States Magistrate Judge

37

## ATTACHMENT B:
## ITEMS TO BE SEIZED

The following items are to be seized:

1. Articles of personal property tending to establish the identity, passports, airline tickets, travel documents, and other items which establish personal identification.

2. Invoices, statements, receipts, contracts, agreements, Western Union and other financial wire transfer service receipts, credit card receipts, money order receipts, records/receipts reflecting payments made by and on behalf of, or received from customers and business associates, records/receipts reflecting electronic funds transfers, documents reflecting safety deposit box locations held by, among, or on behalf of said entities and persons, payroll records, loan records, owner/partner distributions, and records/receipts tending to reflect payments made by or refunds made to customers and business associates or the expenditure of funds received from customers or business associates.

3. Address books, files and records evidencing the identity of customers, clients and associates; business correspondence, facsimile records, correspondence to/from overnight courier services, accounting ledgers and journals; work papers, customer lists, personnel records, pay records, and customer complaints against the company, and other associated companies and individuals.

4. Bank, financial institution, and investment account records, check books, statements, deposit slips, canceled checks, customer checks, cashier's checks, cash in excess of $1,000, loan records, financial statements, credit reports, records of wire transfer, treasurer's checks, keys to safe-deposit boxes, and tax returns and return information.

5. Records of corporations, partnerships, joint ventures and business trade names.

6. Any and all documents and materials relating to the purchase or sale of real estate including loan files, title company records, mortgage loan applications, correspondence, escrow records and instructions, lender verifications of employment records, HUD-1s, copies of appraisals, invoices for work or credits claimed.

7. All periodic account statements sent to members or client investors.

8. All correspondence, contracts, drafts of contracts, option contracts, joint venture agreements and settlement agreements.

9. All financial plans, worksheets, copies of tax returns, Forms 1099, Forms W-2, pay stubs, bank statements, and other financial records of members or client investors.

10. All private placement memoranda (PPM) and documents related to offers of sale of securities or units of ownership of the NARAS Secured Fund LLC, NARAS Secured Fund #2 LLC and

1

any other investment fund.

11. Any documents, records or materials that evidence newspaper, internet or other advertizing or solicitation of tenants to rent residential properties.

12. Shipping documents/receipts to or from Federal Express, Airborne Express, United Parcel Service, the United States Postal Service, and opened and unopened United States Mail and/or items shipped by other courier services.

13. Any documents related to civil actions and claims and any recordings of telephone conversations, employee conversations, and answering machine tapes pertaining or related to business operations.

14. Any and all documents pertaining to: Lee Loomis, Lisa A. Loomis, John Hagener, Paul Hagener, Loomis Wealth Solutions, Advantage Financial Group ("AFG"), AFG Holdings LLC, AFG Technologies, AFG Holdings Management, Advantage Financial Partners of California LLC, Advantage Financial Partners of Illinois LLC, AFP of Utah, Nationwide Lending Group, NARAS Secured Fund LLC, NARAS Secured Fund #2 LLC, Lismar Financial Services LLC, North State Property Management, Green Ivy Property Management, Stony Creek Partners LLC, Essence Financial, LW Premier Holdings LLC, Park Place Partners, Lender Services Direct, Inc., Christopher Warren, Scott Cavell, Dawn Powers, Superior Escrow Closings, Michael Llamas, Peter Woodard, Joseph Gekko, Johnny "Jay" Grivette, Jr., G & L Real Estate, L & G Mortgage Company, Sunvest Communities USA, Ranchwood Homes, KB Homes, and Garret Griffith Gililland III.

15. Documents, programs, applications or materials created, modified or stored in any form, including electronic or computerized data.

16. In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedures:

    a. Upon securing the area around the person of Lee Loomis, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items can be searched in the area in a reasonable amount of time and without jeopardizing the ability to preserve the data. If such material may be safely searched within a reasonable period of time, then the law enforcement personnel with computer expertise who are conducting the searches are directed to do so.

    b. If the computer personnel determine it is not practical to perform an on-site search of the data within a reasonable amount of time, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

    c. In searching the data, the computer personnel may screen the data contained in the computer equipment and storage devices to view their precise contents and determine

2

whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

d. If the computer personnel determine that the data does not fall within any of the items to be seized pursuant to this warrant, the government will return these items within a reasonable period of time not to exceed 90 days from the date of seizure unless further authorization is obtained from the Court.

17. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

a. Any computer equipment, software, and storage device capable of being used to commit, further or store evidence of Mail Fraud, Wire Fraud, Bank Fraud, Conspiracy, Money Laundering, Engaging in Monetary Transactions Over $10,000 in Property Derived from Specified Unlawful Activity, and Identity Theft, in violation, respectively, of Title 18 United States Code, Sections 1341, 1343, 1344, 1349, 1028, 1956, 1957, and 1028;

b. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, thumb drives, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, personal digital assistants;

d. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

e. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

3